**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**RAMPART RESOURCES, INC.**                    **CIVIL ACTION**

**VERSUS**                                     **NO. 23-6895**

**RAMPART/WURTH HOLDING, INC.**                **SECTION: D (5)**

## <u>ORDER AND REASONS</u>

Before the Court is a Motion for Preliminary Injunction filed by the Plaintiff, Rampart Resources, Inc.[1]  The Defendant, Rampart/Wurth Holding, Inc., opposes the Motion.[2]  The Plaintiff has filed a reply in support of its Motion.[3]  At the request of the parties, the Court held Oral Argument on the Preliminary Injunction Motion.[4]  After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **DENIES** the Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Founded in 1989, Plaintiff Rampart Resources, Inc. ("Rampart Resources") is a Louisiana corporation headquartered in Baton Rouge, Louisiana that provides land and real estate services including right-of-way acquisition, servitudes, real estate brokerage, permitting, land services, and property management across several industries including utilities, oil and gas, renewable energy, and public works.[5]  According to the Plaintiff, most of their current business involves land use issues but

---

[1] R. Doc. 4.
[2] R. Doc. 11.
[3] R. Doc. 18.
[4] R. Doc. 30.
[5] R. Doc. 1 at ¶ 2.

does not involve any property management.[6]  Nevertheless, Plaintiff has previously managed residential properties for ExxonMobil and multifamily apartment units for the City of Baton Rouge.[7]  Plaintiff's own website states: "Our core services include right-of-way acquisition, surveying, permitting, project planning, and E&P land rights management."[8]  Plaintiff's clients are predominately corporate entities and municipalities such as Entergy, ExxonMobil, and The Baton Rouge Water Works Company[9]; however, as part of its business, Plaintiff regularly interacts with non-client individual landowners to assist its clients in acquiring land.[10]  Although based in Louisiana, Plaintiff maintains an office outside of the state[11] and provides services to clients in Texas, Arkansas, Mississippi, Alabama, West Virginia, and Ohio.[12]

---

[6] During the January 10, 2024 Oral Argument, the Court asked Plaintiff's counsel and Plaintiff's President, Allan Butler, what amount of Plaintiff's work involves property management.  Butler informed the Court that Plaintiff does not currently perform any property management, but that Plaintiff offers that as a potential service to customers.

[7] R. Doc. 1 at ¶ 16.

[8] R. Doc. 11 at p. 9.

[9] R. Doc. 1 at ¶ 18.

[10] R. Doc. 1-3, *Declaration of Allan Butler* ("*Butler Decl.*"), at ¶ 8.

[11] Plaintiff has offices in New Orleans and Baton Rouge, Louisiana and Houston, Texas.  R. Doc. 1 at ¶ 8.

[12] *Id.* at ¶ 2.

Plaintiff applied for and received a trademark[13] from the United States Patent and Trademark Office for its "Rampart Resources" logo.[14]  Specifically, Plaintiff's protected trademark, per Registration Number 5,609,680 registered November 20, 2018, consists of "the stylized wording 'RAMPART RESOURCES' to the right of a graphic image of a road going into the horizon, with a road curving off to the right and left of the main road."[15]  Plaintiff has used the mark in commerce since January 24, 1989.[16]  Plaintiff did not apply for, and does not have, a  specific word mark for the name "RAMPART" or "RAMPART RESOURCES."

Also founded in 1989, Defendant Rampart/Wurth Holding, Inc., is a Louisiana-based real estate company offering three different types of property management services: (1) multifamily management services for multifamily units; (2) commercial management services; and (3) single-family and small multifamily management and maintenance services.[17]  Each of these three separate types of services is handled by a separate brand within Rampart/Wurth Holding, Inc.: (1) Rampart Multifamily

---

[13] To be precise, Plaintiff applied for and received a "service mark" which is a type of mark used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."  15 U.S.C. § 1127; *see also* R. Doc. 1-1 at p. 1.  Conversely, a "trademark" is a type of mark used "to identify and distinguish . . . goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  However, the Lanham Act treats service marks as identical to trademarks, *see* 15 U.S.C. § 1053 ("[W]hen registered [service marks] shall be entitled to the protection provided in this chapter in the case of trademarks[.]"), and courts routinely apply the same analysis in an infringement action regardless of whether the mark at issue is technically a service mark or a trademark, *see, e.g., Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607 (5th Cir. 2023); *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 635 n.1 (N.D. Tex. 2022).  Because the term "service mark" is less frequently used in the case law, the Court uses the term "trademark" throughout.
[14] R. Doc. 1-1 at p. 1.
[15] *Id.*
[16] *Id.*
[17] R. Doc. 11 at p. 3.

Management; (2) Rampart Commercial Management; and (3) Wurth Real Estate Services.[18]   While the Defendant's principal clients are owners of commercial and residential real estate, the Defendant also occasionally interacts with the residents and tenants of their clients.[19]   Some of the specific services provided by the Defendant include rent collection, resident/tenant placement and screening, property maintenance and repairs, property inspections, and eviction services.[20]   Defendant does not offer any land use or right-of-way services.[21]   The home page of Defendant's website states: "Property Management is All We Do."[22]

Defendant was previously known as Latter & Blum Property Management, Inc. until it rebranded and changed its name on March 27, 2023 to Rampart/Wurth Holding, Inc. "to emphasize the distinction between its property management services and the real estate brokerage services of Latter & Blum, Inc.," a related entity.[23]   According to the Defendant, it chose the name "Rampart" as a reference to the street of the same name in New Orleans, Louisiana.[24]

The Plaintiff first became aware of the Defendant's name change to "Rampart/Wurth Holding, Inc." and of its new brands, "Rampart Multifamily Management" and "Rampart Commercial Management," in late September 2023 when a FedEx delivery driver told Plaintiff's President, Allan Butler, that "another

---

[18] *Id.*

[19] R. Doc. 11-1, *Declaration of Joseph S. Pappalardo, Jr.* ("*Pappalardo Decl.*"), at ¶¶ 31, 35.  The phone calls mistakenly made to the Plaintiff suggest that the tenants and potential tenants of Defendant's clients contact the Defendant on a not infrequent basis. *See* R. Doc. 1 at ¶ 22.

[20] R. Doc. 11 at p. 3.

[21] *Id.*

[22] *See* R. Doc. 1-2 at p. 2.

[23] R. Doc. 11 at p. 3.

[24] R. Doc. 11-1, *Pappalardo Decl.*, at ¶ 7.

Rampart" had recently opened in Baton Rouge and that she had mistakenly gone to Defendant's office instead of Plaintiff's.[25]   The FedEx driver allegedly found the Defendant's name change confusing.[26]   According to Butler, the FedEx driver further relayed that individuals at the Defendant's office told her that the Defendant was a different company than the Plaintiff and that the Defendant had recently rebranded from Latter & Blum.[27]

Soon after his encounter with the FedEx driver, Butler began investigating whether any other person had confused the Plaintiff with the Defendant.[28]   Several employees informed Butler that they had received multiple telephone calls in September and October 2023 from individuals attempting to contact the Defendant.[29] These calls included: (1) a call to project manager Kara Andrus in which the caller asked about paying rent, Ms. Andrus informed the caller that the Plaintiff has no projects where it collects rent and that the caller must be looking for a different Rampart, and the caller responded, "so you're telling me this isn't Rampart in Baton Rouge?"[30]; (2) a call to accounting manager Cindy Pettiss where the caller asked about speaking to someone about a lease involving "units," Ms. Pettiss responded that the caller had the wrong number as she believed that caller had intended to call a different company to which the caller stated: "This is the home office of Rampart, correct? This is the number I got for Rampart."[31]; (3) a call to Receptionist Avarie

---

[25] R. Doc. 1-3, *Butler Decl.*, at ¶ 6.
[26] *Id.*
[27] *Id.*
[28] *Id.* at ¶ 7.
[29] *Id.* at ¶ 9.
[30] *Id.* at ¶ 9(a); R. Doc. 1-5, *Declaration of Kara Andrus* ("*Andrus Decl.*"), at ¶ 3.
[31] R. Doc. 1-3 at ¶ 9(b); R. Doc. 1-6, *Declaration of Cindy Pettiss* ("*Pettiss Decl.*"), at ¶ 3.

Dugas where the caller began complaining about how certain properties were not being maintained and how certain items needed maintenance at which point Ms. Dugas advised the caller that the caller had the wrong number to which the caller responded, "This is Rampart, right?" and to which Ms. Dugas clarified that the number belonged to Rampart Resources and that the caller had the wrong number[32]; (4) an October 13, 2023 call at 12:54 p.m. to Ms. Dugas where the caller complained about not hearing from anyone about her Section 8 housing voucher and lack of communication to which Ms. Dugas advised that the caller had contacted Rampart Resources and that the caller had the wrong number[33]; (5) an October 20, 2023 call at 12:15 p.m. to Ms. Dugas in which the caller asked about submitting lease payments on an online portal and asked "Isn't this Rampart?" after Ms. Dugas informed the caller that he had the wrong number to which Ms. Dugas responded that he had reached Rampart Resources and had the wrong number[34]; (6) an October 30, 2023 call at 1:10 p.m. where the caller asked Ms. Pettiss about leasing a unit with the Plaintiff which Ms. Pettiss believed was an unusual request and informed the caller that she had contacted the wrong company and had the wrong number[35]; and (7) a November 22, 2023 call at 11:00 a.m. to Ms. Dugas where the caller stated that Jefferson Lakes Apartments had given her Plaintiff's phone number to refund a

---

[32] R. Doc. 1-3 at ¶ 9(c); R. Doc. 1-7, *Declaration of Avarie Dugas* ("*Dugas Decl.*"), at ¶ 3.
[33] R. Doc. 1-3 at ¶ 9(d); R. Doc. 1-7, *Dugas Decl.*, at ¶ 4.
[34] R. Doc. 1-3 at ¶ 9(e); R. Doc. 1-7, *Dugas Decl.*, at ¶ 5.
[35] R. Doc. 1-3 at ¶ 9(g); R. Doc. 1-6, *Pettiss Decl.*, at ¶ 4.

deposit to which Ms. Dugas explained that Plaintiff had no affiliation with Jefferson Lakes Apartments and that the caller had the wrong number.[36]

After discovering the existence of the Defendant, Plaintiff sent a cease-and-desist letter to the Defendant on October 2, 2023 demanding that the Defendant immediately stop using the Rampart name and any of Plaintiff's marks.[37]  Plaintiff sent one copy to the Defendant's business office address and one copy to the residential address of Defendant's President, Joseph S. Pappalardo, Jr.[38]  The Plaintiff never heard back from the Defendant.[39]  The Defendant avers that it never received the copy of the letter sent to Defendant's corporate address and received the copy sent to the residential address on or about the same day as this lawsuit was filed, November 16, 2023.[40]

Not having heard from the Defendant, Plaintiff filed this suit in this Court on November 16, 2023 invoking the Court's federal-question jurisdiction.[41]  Plaintiff's Verified Complaint[42] alleges claims under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), for trademark infringement, unfair competition, false designation of origin, passing off, and false advertising.[43]  Simultaneous with the filing of the Verified

---

[36] R. Doc. 18-1, *Declaration of Avarie Dugas* ("*Dugas Decl.*"), at ¶ 3; R. Doc. 18-2, *Declaration of Allan Butler* ("*Butler Decl.*"), at ¶ 3.  Butler alleges that Jefferson Lakes Apartments is a client of the Defendant.  R. Doc. 18-2, *Butler Decl.*, at ¶ 4.

[37] R. Doc. 1-8.

[38] *Id.*

[39] R. Doc. 1 at ¶ 27.

[40] R. Doc. 11-1, *Pappalardo Decl.*, at ¶ 24. Mr. Pappalardo confirmed at the Oral Argument that he received a copy of the cease-and-desist letter sent to the residential address on or about November 16, 2023.

[41] R. Doc. 1.

[42] *Id.*  Plaintiff's Verified Complaint includes a Verification signed by Plaintiff's President, Allan Butler.  *See id.* at p. 18.  The Court considers the allegations in a verified complaint as if they were contained in an affidavit or declaration.  *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003).

[43] *See* R. Doc. 1 at ¶¶ 31–45.

Complaint, Plaintiff also filed the instant Motion for Preliminary Injunction in which the Plaintiff asks the Court to enjoin the Defendant from infringing the Plaintiff's mark by using the "Rampart" name and from engaging in any unfair competition, false designations of origin, unlawful passing off, and/or false advertising by using the "Rampart" name.[44]

In their preliminary injunction Motion, the Plaintiff contends that they are likely to succeed on the merits of their trademark claims because they have a legally protectable mark and because there is a strong likelihood of confusion between Plaintiff's and Defendant's marks.[45]  As to the likelihood of confusion, Plaintiff emphasizes that both the Plaintiff and Defendant operate in the real estate market in similar geographic markets and leans heavily on the evidence of actual confusion among the callers to Plaintiff and the FedEx driver.[46]  Plaintiff also contends that it has established a showing of irreparable harm, that the balance of the equities falls in its favor, and that the injunction is in the public's interest.[47]

The Defendant filed a response in opposition to the Motion, primarily arguing that the Plaintiff has failed to demonstrate a likelihood of confusion among the respective marks.[48]  The Defendant argues that there is little similarity between the marks and that the only overlap—the word "Rampart"—does not in and of itself cause confusion.[49]  Defendant further contends that the word "Rampart" is used pervasively

---

[44] R. Doc. 4.
[45] R. Doc. 4-1.
[46] *Id.* at pp. 16–21.
[47] *Id.* at pp. 22–24.
[48] R. Doc. 11.
[49] *Id.* at pp. 4–7, 16–17.

in the New Orleans area and is geographically descriptive.[50]  The Defendant also emphasizes that while both it and the Plaintiff perform real estate-related services, the specific services provided by each party differ greatly with the Plaintiff principally focusing on land use issues and the Defendant providing only property management services.[51]  As to Plaintiff's evidence of actual confusion, the Defendant responds that none of Plaintiff's evidence shows that any purchases were redirected from the Plaintiff to the Defendant (or vice-versa) and questions whether it was actually the Defendant that the various callers were intending to reach.[52]  In sum, Defendant contends that Plaintiff has not shown a likelihood of success on the merits and, therefore, that no preliminary injunction should be issued.

In reply, the Plaintiff responds to the Defendant's argument regarding the evidence of actual confusion, claiming that under binding Fifth Circuit precedent the Plaintiff need not show that any actual customers were confused by the marks.[53]  The Plaintiff also argues that the Defendant misstated several facts and issues of law in its briefing and that there is no evidence that Plaintiff's name has any relation to Rampart Street in New Orleans.[54]  Finally, the Plaintiff contends that the other preliminary injunction factors weigh in its favor and that the Defendant failed to address Plaintiff's argument on its other, non-infringement, trademark claims.[55]

---

[50] *Id.* at pp. 2–4.
[51] *Id.* at pp. 7–10, 17–18.
[52] *Id.* at pp. 20–21.
[53] R. Doc. 18 at pp. 2–5.
[54] *Id.* at pp. 5–8.
[55] *Id.* at pp. 8–11.

This Court held a Telephone Status Conference on December 19, 2023 at which time the parties agreed that an evidentiary hearing on the preliminary injunction Motions was unnecessary.[56]  Both parties agreed that the Motion would be submitted on the briefing and exhibits filed in the record.[57]  Counsel for the Defendant, however, requested oral argument on the Motion which the Court granted without objection from the Plaintiff.[58]  The Court held Oral Argument on January 10, 2024 at which time counsel for the parties presented their case to the Court.[59]  Plaintiff's President, Allan Butler, and Defendant's President, Joseph Pappalardo, Jr., were both present at the hearing.

## II.   LEGAL STANDARD

"The several courts vested with jurisdiction of civil actions arising under [trademark law] shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title."[60]  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[61]

Federal Rule of Civil Procedure 65(a) governs the issuance of preliminary injunctions.  To obtain a preliminary injunction, a movant must establish: (1) a

---

[56] R. Doc. 24.
[57] *Id.*
[58] *Id.*; R. Doc. 12.
[59] R. Doc. 30.
[60] 15 U.S.C. § 1116.
[61] *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.[62]  "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements."[63]

## III.    ANALYSIS

Under the Lanham Act, the owner of a mark used in interstate commerce can bring infringement actions in federal court.[64]  A claimant must show two elements to prevail on a claim of trademark infringement under the Lanham Act: "(1) it possesses a legally protectable trademark and (2) [the alleged infringer's] use of this trademark 'creates a likelihood of confusion as to source, affiliation, or sponsorship.'"[65]  The Court considers each element in turn.

### A.    Legally Protectable Trademark

To be protectable, a trademark must be distinctive.[66]  A legally protectable mark "must be 'distinctive' in one of two ways": (1) inherent distinctiveness, or (2) acquired distinctiveness through secondary meaning.[67]  Inherent distinctiveness

---

[62] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

[63] *Planned Parenthood of Houston & Se. Texas v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quoting *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara* 335 F.3d 357, 363 (5th Cir. 2003) (internal quotation marks omitted)).

[64] 15 U.S.C. § 1114(1)(a); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

[65] *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (citing *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

[66] *See* 15 U.S.C. § 1052(e), (f); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010).

[67] *Nola Spice Designs,* 783 F.3d at 537 (citation omitted).

exists if a mark's "intrinsic nature serves to identify a particular source."[68]  "[A] mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"[69]

"Marks are classified along a spectrum in order of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."[70]  Marks that are suggestive, arbitrary, or fanciful are inherently distinctive and entitled to protection; however, descriptive marks are only distinctive if they have acquired secondary meaning.[71]  A generic mark "refers to the class of which a good is a member."[72]  A descriptive mark gives information about a product's features.[73]  A suggestive mark is one that "hint[s] at the product's characteristics"[74] while an arbitrary mark "provide[s] no indication as to the product's characteristics."[75]  Finally, a mark is fanciful if it consists of "made-up words."[76]

---

[68] *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (quoting *Two Pesos*, 505 U.S. at 768).

[69] *Id.* at 211 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11 (1982)).

[70] *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 618 (5th Cir. 2023) (citing *Two Pesos*, 505 U.S. at 768); *accord Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (Friendly, J.).

[71] *See Wal-Mart Stores*, 529 U.S. at 210–11.

[72] *Rex Real Estate*, 80 F.4th at 619 (citing *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009)).

[73] *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 641 (N.D. Tex. 2022).

[74] *Id.* (citing J. Thomas McCarthy, 2 McCarthy on Trademarks § 11:72 (5th ed. 2018)).

[75] *Id.* (citing McCarthy § 11:13).

[76] *Id.* (citing McCarthy § 11:8).

Registration of a mark with the Patent and Trademark Office ("PTO") is "prima facie evidence" of a mark's inherent distinctiveness.[77]  However, "[t]his presumption of validity may be rebutted by establishing that the mark is not inherently distinctive."[78]  Plaintiff has a registered trademark,[79] and Defendant conceded at oral argument that Plaintiff's mark is legally protected.  However, Defendant points out, and Plaintiff does not contest, that Plaintiff does not own a specific word mark for either "Rampart" or "Rampart Resources."[80]  To quote Plaintiff's PTO Registration, Plaintiff's legally protectable mark is "the stylized wording 'RAMPART RESOURCES' to the right of a graphic image of a road going into the horizon, with a road curving off to the right and left of the main road."[81]

The Court finds that Plaintiff's mark is distinctive and thus legally protectable.  Initially, as discussed above, Plaintiff's mark is registered with the PTO and thus is entitled to a presumption of validity.[82]  Moreover, Plaintiff's mark is "arbitrary" because "Rampart Resources" neither describes nor suggests anything about the services Plaintiff provides.[83]  The word "Rampart" has no apparent connection to right-of-way acquisition, servitude, and land use issues.[84]  Although Defendant

---

[77] *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.,* 783 F.3d 527, 537 (5th Cir. 2015).

[78] *Amazing Spaces*, 608 F.3d at 237 (citing *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979)).

[79] R. Doc. 1-1 at p. 1.

[80] R. Doc. 11 at p. 17.

[81] R. Doc. 1-1 at p. 1.

[82] 15 U.S.C. § 1115(a).

[83] *See Nola Spice Designs*, 783 F.3d 527, 540 (5th Cir. 2015) ("Arbitrary marks 'bear no relationship to the products or services to which they are applied.'" (quoting *Amazing Spaces*, 608 F.3d at 241)).

[84] Although, as Plaintiff points out, the term "rampart" means "stronghold or fortress," the Court does not find that because "rampart" possibly refers to a type of structure that the mark therefore is suggestive of the real estate services provided by the Plaintiff.  Such a connection is tenuous at best and neither party contends that the mark is suggestive.

contends that Plaintiff's mark is merely geographically descriptive "[g]iven the prominence and geographic designation of Rampart Street in New Orleans," Defendant provides no evidence other than pure speculation that Plaintiff's mark is named after Rampart Street or has any relation whatsoever to Rampart Street. "[A] mark is not primarily geographically descriptive if (1) it does not identify the place or the region from where the goods come, or (2) it does not suggest that the goods come from the place or region named by the mark."[85]   As Plaintiff points out, Plaintiff is headquartered in Baton Rouge, not New Orleans, and there is no evidence in the record that a Rampart Street exists in Baton Rouge.[86]   Moreover, Plaintiff does not have an office on Rampart Street and operates in several other states outside of Louisiana.[87]   Defendant's argument that the mark is geographically descriptive is further contradicted by its own evidence of other entities with no apparent connection to New Orleans that have the word "Rampart" in their name.   Unlike, say, "Carondelet," "Tchoupitoulas," or a host of other well-known New Orleans streets, "Rampart" has no inherent connection to New Orleans or to any specific geographical feature.

Furthermore, while the Court is not obliged to agree with the PTO's conclusions, the Court notes that Plaintiff could not have registered its mark had the PTO found the mark to be merely geographically descriptive.[88]   Without any evidence

---

[85] *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 486 (5th Cir. 1971).

[86] R. Doc. 18 at p. 8.

[87] *Id.*

[88] *See Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 641 (N.D. Tex. 2022) ("Even though the PTO is not the typical agency to whom deference might be owed . . . the Court finds that the Trademark Examiner's decision is further evidence of the Mark's protectability." (internal citations omitted)); 15 U.S.C. § 1052(e).

that Plaintiff chose its mark as a reference to Rampart Street in New Orleans, the Court does not find the mark to be descriptive. Because Plaintiff's mark is federally registered and because it is arbitrary, Plaintiff is substantially likely to prevail in showing that its mark is legally protectable.

## B.   Likelihood of Confusion

Likelihood of confusion is the "paramount question" in a trademark infringement action.[89]  To evaluate the likelihood of confusion between two marks, the Fifth Circuit considers eight factors, or "digits of confusion."[90]  "No digit is dispositive, and the digits may weigh differently from case to case, depending on the particular facts and circumstances involved."[91]  The eight digits are: "(1) the type of trademark; (2) mark similarity; (3) product [or service] similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers."[92]  "'Likelihood of confusion' means "more than a mere possibility" of confusion; rather, "the plaintiff must demonstrate a *probability* of confusion."[93]  The Court analyzes each digit which together address the likelihood of confusion element.

---

[89] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009).
[90] *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 620 (5th Cir. 2023) (citing *Xtreme Lashes*, 576 F.3d at 227).
[91] *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 227) (internal quotation marks omitted).
[92] *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 227).
[93] *Xtreme Lashes*, 576 F.3d at 227 (citing *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)) (emphasis added).

### 1. The Type of Trademark

"'Type of trademark' refers to the strength of the senior mark."[94]   A court analyzes two factors regarding the strength of a mark: "(1) the mark's position along the distinctiveness spectrum, and (2) the standing of the mark in the marketplace."[95] "Strong marks receive 'the widest ambit of protection,' and weak marks do not."[96]

This first digit weighs in Plaintiff's favor.  As discussed above, Plaintiff's mark is arbitrary because "Rampart" has no apparent relation to the real estate services provided by the Plaintiff and is thus neither descriptive nor suggestive.  An arbitrary mark is a strong mark, all things being equal.[97]

Besides the mark's standing on the spectrum, to determine strength, the Court also considers the mark's "standing in the marketplace."[98]  "[E]vidence of 'third-party single and multi-word uses' of a mark tends to show weakness."[99]  While a court may consider third-party usage in other industries of the mark or of a term in the mark, "third-party usage is especially relevant when it falls within the same industry or category of services."[100]  Moreover, a court may consider third-party usage of the "portion of the plaintiff's mark that the defendant also uses."[101]

---

[94] *Rex Real Estate*, 80 F.4th at 620 (quoting *Xtreme Lashes*, 576 F.3d at 227).

[95] *Id.* (quoting *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 814 (5th Cir. 2019) (internal quotation marks omitted).

[96] *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289–90 (5th Cir. 2020) (quoting *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981)).

[97] *Xtreme Lashes*, 576 F.3d at 227 ("More distinctiveness and less natural or literal content correspond with increased mark strength." (citing *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir. 1980))).

[98] *Future Proof Brands*, 982 F.3d at 293 (quoting *Sun Banks*, 651 F.2d at 315).

[99] *Id.* (quoting *Sun Banks*, 651 F.2d at 316).

[100] *Rex Real Estate*, 80 F.4th at 620.

[101] *Future Proof Brands*, 982 F.3d at 294 (citing *Sun Banks*, 651 F.2d at 314, 316).

Here, Defendant claims that the word "Rampart"—which both Plaintiff and Defendant agree is the only "portion of the plaintiff's mark that the defendant also uses"[102]—has been used by numerous other third parties and thus argues that Plaintiff's mark is weak.[103]  According to the Defendant, "numerous" other companies in the New Orleans area use the name "Rampart" including "Rampart Apartments," "Rampart Treehouse," and "North Rampart Community Center."[104]  Defendant also contends that "dozens" of trademarks registered with the PTO include the name "Rampart" such as "Rampart Communications," "Rampart Resolve," "Rampart Stronghold," and "Rampart Road Cases."[105]  Neither party has provided any evidence that any of these entities are in the real estate industry although, as Defendant contended at the Oral Argument, "Rampart Apartments" is likely part of the real estate industry.

In response, Plaintiff focuses on the length of time that Plaintiff has used its mark, 34 years, its reputation in the industry, and its promotion of its company through "sponsorship of prominent charity and other events, targeted advertising, use of branded items such as shirts, jackets, coozies (also referred to as koozies), cups, and tents, banners, signage at its office locations, marketing materials such as fliers and folders, and at times, print advertising."[106]  Plaintiff does not dispute Defendant's claim that numerous other entities also use the "Rampart" name in their mark.

---

[102] *Id.*

[103] At Oral Argument, Plaintiff's counsel confirmed "The issue, Judge, is the use of the word Rampart in the mark," and further conceded that the actual design is different.

[104] *See* R. Doc. 11 at pp. 4, 11; R. Doc. 11-1, *Pappalardo Decl.*, at ¶ 7.

[105] *See* R. Doc. 11 at p. 11; R. Doc. 11-1, *Pappalardo Decl.*, at ¶ 27.

[106] R. Doc. 4-1 at p. 14.

The Court finds that the extensive third-party usage of the word "Rampart" weakens Plaintiff's mark.  That being said, Defendant has not provided satisfactory evidence of any Rampart-named entities in the real estate industry, with the possible exception of "Rampart Apartments."  Nevertheless, it is evident that "Rampart" is widely used by companies both within and outside of the New Orleans area.  This weakens Plaintiff's mark.  Moreover, Plaintiff's sponsorship of certain events and promotion of branded items does little on its own to counteract Defendant's evidence of widespread usage of the key portion of Plaintiff's mark.  Still, taken together with the first factor, which points toward a strong mark, the Court finds that Plaintiff's mark is relatively strong and that this factor tips in favor of a likelihood of confusion, although not heavily so.

### 2.  Mark Similarity

Mark similarity "is determined by comparing the marks' appearance, sound, and meaning."[107]  A court should make such determination "on the basis of the total effect of the designation, rather than on a comparison of individual features" but "should give more attention to the dominant features of a mark."[108]

Plaintiff's mark was described earlier in this Order in the second paragraph of the Factual and Procedural Background.  Defendant utilizes two marks.  There are two variations of the first mark, one for Rampart Multifamily Management and the other for Rampart Commercial Management.  Defendant's first mark is red and blue

---

[107] *Rex Real Estate*, 80 F.4th at 621–22 (citing *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998)).

[108] *Id.* (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 228 (5th Cir. 2009)) (internal quotation marks omitted).

and features "a key design with its branding of Rampart Multifamily Management and Rampart Commercial Management,"[109] and its company name in an "artistic, old-style font."[110]  The specific brand name, *i.e.*, Rampart Multifamily Management or Rampart Commercial Management, is positioned above and to the left of the key design and is in a serif font.[111]  Defendant's second mark "includes a key . . . and two Rs to signify the two [Rampart brands]."[112]  The second mark contains no text and is not challenged by the Plaintiff.

In its briefing, Plaintiff argues Defendant's first mark is similar to its mark "by sight and meaning" because Defendant's mark uses the Rampart name "alongside various terms signifying that Defendant engages in property management and real estate services."[113]  In its opposition, Defendant argues that Plaintiff's mark is different in that it uses "all-capitalized, block letters" while Defendant uses an "artistic, old-style font."[114]  In addition, Defendant notes that Plaintiff's mark is not in color while Defendant's is red and blue.[115]  At Oral Argument, the Plaintiff conceded that the only similarity between the two marks was the term "Rampart" and that all other aspects of the marks are different including the font, the color, and the accompanying graphic.[116]

---

[109] R. Doc. 11 at p. 4.
[110] *Id.* at p. 5.
[111] *See id.* at p. 4.
[112] *Id.*
[113] R. Doc. 4-1 at pp. 16–17.
[114] R. Doc. 11 at p. 5.
[115] *Id.*
[116] *See* n.102.

The similarity between the marks is not substantial.  The marks employ different font styles, contain different graphics positioned on different sides of the text,[117] and feature different colors.  Further, while both prominently feature the word "RAMPART,"[118] neither use the word on its own; rather Plaintiff's mark states "RAMPART RESOURCES" while Defendant's marks state "RAMPART MULTIFAMILY MANAGEMENT" and "RAMPART COMMERCIAL MANAGEMENT."[119]  Although the word "RAMPART" is included on both marks, that is the only similarity between the marks.[120]  That Defendant's mark includes other real estate-related terms, *i.e.*, "Multifamily Management" and "Commercial Management" does not create greater similarity among the marks;  the additional terms, if anything, create dissimilarity.[121]  The Court finds that, when considering "the total effect of the designation,"[122] the marks are not similar.  This factor weighs in favor of the Defendant.

---

[117] There is no similarity between the logos on the marks whatsoever and Plaintiff does not claim that there is.

[118] *See* J. Thomas McCarthy, 4 McCarthy on Trademarks § 23:44 (5th ed. 2023) (explaining that "one feature of a mark may be more significant and it is proper to give greater force and effect to that dominant feature").

[119] *See* R. Doc. 11 at p. 4.

[120] *See Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 296 (5th Cir. 2020) ("[O]ur precedent says only that '[s]imilarity of sound . . . *may* be taken into account,' not that we should place aural similarity on a pedestal." (quoting *Marathon Mfg. Co. v. Enerlite Prod. Corp.*, 767 F.2d 214, 219 (5th Cir. 1985))). *Cf. Bd. of Regents of the Univ. of Houston Sys. on Behalf of the Univ. of Houston Sys. & Its Member Institutions v. Houston Coll. of L., Inc.*, 214 F. Supp. 3d 573, 587 (S.D. Tex. 2016) (finding a similarity of marks where "two of the three words in Defendant's mark appear in [Plaintiff's] mark").

[121] In *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association*, the Fifth Circuit found the marks of the parties different even though both marks used the term "Sun" alongside financial related terms, suggesting that the inclusion of similar industry-related terminology in one's mark does not by itself demonstrate similarity of the marks. 651 F.2d 311, 317–18 (5th Cir. 1981).

[122] *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 622 (5th Cir. 2023) (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 228 (5th Cir. 2009)).

### 3. Service Similarity

The third factor considers the similarity of the services provided by the parties. "The greater the similarity between the products and services, the greater the likelihood of confusion."[123]   Likewise, dissimilarities between the services provided by the plaintiff and the defendant "lessen the possibility of confusion, mistake, or deception."[124]   Where the respective services "are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection."[125]   "The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand."[126]   Importantly, "[t]he actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand . . . Consumer perception is the controlling factor."[127]

Plaintiff argues that this factor weighs in its favor as both parties provide "land, real estate, and property management services throughout Louisiana and Texas."[128]   Plaintiff claims its services include "right of way acquisition, permitting, land services, real estate brokerage, and property management services."[129]   At Oral Argument, Plaintiff conceded that it does not presently engage in any property management, but that it offers such services to its clients.   Defendant points out in

---

[123] *Id.* (quoting *Exxon Corp. v. Texas Motor Exch. Of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)).
[124] *Id.* (quoting *Exxon Corp.*, 628 F.2d at 505).
[125] *Id.* (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998)).
[126] *Id.* (quoting *Elvis Presley Enters.*, 141 F.3d at 202).
[127] *Id.* (quoting *Elvis Presley Enters.*, 141 F.3d at 202).
[128] R. Doc. 4-1 at p. 17.
[129] *Id.* at p. 2.

its Opposition, and at Oral Argument, that Plaintiff sought the trademark specifically

for the following services:

> [L]and acquisition services, namely, route selection, right
> of entry and right-of-way acquisition; project management
> serves [sic] for others for business purposes, namely,
> managing land acquisition programs; land cost estimates,
> namely, real estate appraisal; real estate brokerage, fee
> title acquisitions; financial analysis and consultation in the
> nature of providing structured settlements for resolving
> personal damage claims; appraisal of real estate, namely,
> transfers of real estate property right in the nature of
> expropriation and condemnation[.][130]

Defendant stresses that Plaintiff did not include "property management" as among

the services, highlighting that the Plaintiff and Defendant mostly offer different

services in the broad real estate industry.  Plaintiff contends that it has previously

managed residential property for several clients including "750–1000 residential

parcels of land for ExxonMobil in Baton Rouge" and a "number of multifamily

apartment units in East Baton Rouge Parish that had been acquired by the City of

Baton Rouge."[131]  Defendant solely provides property management services such as

"rent collection, resident/tenant placement and screening, property maintenance and

repairs, property inspections, and eviction services" for both commercial and

residential property.[132]

    The evidence provided to the Court shows only a minor overlap in the services

provided by the parties.  While both Plaintiff and the Defendant offer property

management services, the record confirms that such services constitute only a small

---

[130] R. Doc. 11 at p. 7 (citing R. Doc. 1-1 at p. 1).
[131] R. Doc. 1 at ¶ 16.
[132] R. Doc. 11 at p. 3.

and infrequent portion of Plaintiff's business. The Fifth Circuit's recent decision in *Rex Real Estate I, L.P. v. Rex Real Estate Exchange, Inc.* is instructive.[133]  In that case, the court held that evidence that the Plaintiff real estate firm had brokered at most nine different sales of single-family homes over a nearly fifteen-year period was insufficient to demonstrate that the Plaintiff, a commercial real estate broker, provided the same services as the Defendant, a residential real estate broker.[134] Analogously, the Court finds that the limited evidence of Plaintiff's past involvement in property management does not demonstrate that the parties currently provide the same type of real estate services.

The lack of direct competition between the parties does not end the analysis, however.  Where the parties' services are noncompeting, the inquiry turns on whether confusion arises from apparent "sponsorship, affiliation, or connection."[135]  Although not addressed by the parties, the Court considers whether the consuming public would reasonably believe that the property management market is one into which the Plaintiff would naturally expand into.  Here, the Court finds such an expansion plausible.  The Court need not delve into any speculation as Plaintiff has *already* entered Defendant's market, albeit in limited fashion.  As addressed above, Plaintiff has previously provided property management services to its clients and while not currently providing such services, offers those services to customers.  It is thus reasonable for Plaintiff's customers to believe that Plaintiff would venture further in

---

[133] 80 F.4th 607 (5th Cir. 2023).
[134] *Id.* at 622 ("Clearly, Plaintiff and Defendant operate in different corners of the real estate market and cater to different sets of prospective customers.").
[135] *Id.* (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998)).

the property management arena given Plaintiff's prior foray.  Moreover, the diverse array of services offered by the Plaintiff increases the likelihood of confusion among the consuming public.[136]

While evidence of direct competition between the parties is limited, the Court finds that the property management business is a reasonable and natural area of expansion for the Plaintiff sufficient to establish a possibility of "sponsorship, affiliation, or connection" between the parties and therefore this factor weighs somewhat in favor of a likelihood of confusion.

### 4. Outlet and purchaser identity

Similarities between the parties' consumers and clients increases the possibility of confusion, mistake, or deception.[137]  Conversely, "[d]ifferences in the parties' customer bases can lessen the likelihood of confusion."[138]  Neither party has provided much evidence of their respective customer bases to the Court, but what evidence the Court does have indicates that there is minimal overlap between the clients of both parties.  Plaintiff's clientele includes municipal and corporate entities, particularly those in the utilities, oil and gas, renewable energy, and public works sectors.[139]  Meanwhile, Defendant's customers are real estate developers and owners

---

[136] *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir. 1982) ("Diversification makes it more likely that a potential customer would associate the non-diversified company's services with the diversified company, even though the two companies do not actually compete.").

[137] *Rex Real Estate*, 80 F.4th at 622 (quoting *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)).

[138] *Sueros Y Bebidas Rehidratantes, S.A. de D.V. v. Indus Enterprises, LLC*, —F. Supp. 3d—, No. CV H-22-1304, 2023 WL 5733841, at *7 (S.D. Tex. Sept. 5, 2023) (quoting *Quantum Fitness Corp. v. Quantum LifeStyle Centers, LLC*, 83 F. Supp. 2d 810, 826 (S.D. Tex. 1999)).

[139] Counsel for Plaintiff as well as Plaintiff's President, Allan Butler, confirmed during Oral Argument that "All our clients are corporate entities and municipalities and the individuals that work there are the ones that procure our services."

of commercial and multifamily property.[140]  The record contains no evidence that any of Plaintiff's clients are also clients of the Defendant, or vice-versa.  Still, given that Plaintiff has previously provided property management services to its clients, it is plausible that there exists some overlap in customer bases.  As Defendant's President, Joseph Pappalardo, Jr., explains, "[a]ny services to utility companies, midstream, and oil and gas pipeline companies would be incidental due to one of these companies separately owning multifamily or commercial property that requires the management services offered by [Defendant]."[141]  Nevertheless, this factor weighs against a finding of a likelihood of confusion.

### 5. Advertising Media Identity

The fifth factor requires the Court to consider the "similarity between the parties' advertising campaigns."[142]  "The greater the similarity in the campaigns, the greater the likelihood of confusion."[143]  "In the case of a service mark, advertising is of even greater relevance because the mark cannot be actually affixed to the service, as a trademark is to the goods."[144]

The parties have dedicated little attention to this factor.  Plaintiff claims that it promotes its services primarily through its website, its "sponsorship of prominent charity and other events," through branded marketing items such as shirts, cups, jackets, banners, signage at its offices, fliers, and folders, and, on occasion, print

---

[140] R. Doc. 11-1, *Pappalardo Decl.*, at ¶¶ 31, 35.
[141] *Id.* at ¶ 31.
[142] *Rex Real Estate*, 80 F.4th at 623 (quoting *Exxon*, 628 F.2d at 506).
[143] *Id.* (quoting *Exxon*, 628 F.2d at 506).
[144] *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 197 (5th Cir. 1998).

advertising.[145]  Likewise, Defendant "maintains an active online advertising presence through its website."[146]  Further, at Oral Argument, both parties indicated that word-of-mouth advertising among their respective customer bases is perhaps their strongest form of advertising.

The Court does not find this factor to be particularly probative here.  While both parties advertise through similar channels in overlapping geographical markets, the parties have presented minimal evidence regarding their own advertising to warrant placing much weight on this factor.  That being said, both parties' "reliance on word-of-mouth advertising may diminish the importance of the dissimilarity between the trademarks."[147]  Contrary to Defendant's contention at Oral Argument, that both parties rely on word-of-mouth advertising if anything *increases* the possibility of confusion because greater emphasis is placed on the word "Rampart" and the distinguishing features between the marks are either lessened or outright eliminated. Based upon the lack of evidence introduced by either party to support this factor, this factor is neutral.

### 6. Defendant's Intent

A defendant's intent to confuse "may alone be sufficient to justify an inference that there is a likelihood of confusion,"[148] but "[i]f there is no evidence of intent to confuse, this factor is neutral."[149]  Plaintiff alleges that Defendant acted with

---

[145] R. Doc. 1-3, *Butler Decl.*, at ¶ 3; R. Doc. 1-4.
[146] R. Doc. 27 at ¶ 19.
[147] *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (1982).
[148] *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 298 (5th Cir. 2020) (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 455 (5th Cir. 2017)).
[149] *Viacom Int'l v. IJR Cap. Invs., LLC*, 891 F.3d 178, 195 (5th Cir. 2018).

"reckless disregard for" or "willful blindness toward" Plaintiff's mark because it continued using the Rampart name after Plaintiff sent a cease and desist letter.[150] This, Plaintiff argues, shows Defendant's intent to confuse the public.[151]   However, the Defendant's President, Joseph Pappalardo, Jr., attests, in his sworn declaration, that Defendant never received such a letter from Plaintiff prior to the present lawsuit.[152]   Further, at Oral Argument, counsel for the Plaintiff conceded that the Plaintiff lacked any evidence of bad faith on the part of the Defendant.[153]   The Court will not infer bad faith on the part of the Defendant without some evidentiary basis for doing so.[154]   As such, there is a lack of evidence of Defendant's intent to confuse, so this factor does not weigh in favor of either party.[155]

### 7. Actual Confusion

The seventh digit, actual confusion, is "the best evidence of a likelihood of confusion."[156]   The party alleging infringement must show that the defendant's use of the marks, rather than another source, caused a likelihood of confusion.[157]   "A plaintiff may show actual confusion using anecdotal instances of consumer confusion,

---

[150] R. Doc. 4-1 at pp. 18–19; *see also* R. Doc. 1-8.

[151] R. Doc. 4-1 at pp. 18–19.

[152] R. Doc. 11-1 at ¶ 24.

[153] Plaintiff's Counsel straightforwardly acknowledged "We have no evidence and don't assert at least at this stage there was any malintent, but we do believe it [Defendant] is infringing on our registered trademark . . . I'm not—I don't stand here this day with any evidence of malintent, Judge."

[154] *See Streamline*, 851 F.3d at 456 ("[T]he majority rule amongst jurisdictions is that a defendant's continued use of a mark even after it receives a cease and desist letter cannot be construed as evidence of intent to confuse." (citing J. Thomas McCarthy, 4 McCarthy on Trademarks § 23:120 (4th ed.))).

[155] Defendant incorrectly states that this factor weighs in its favor.  *See* R. Doc. 11 at p. 20.  Where there is no evidence of intent to confuse, the sixth factor is neutral.  *See Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 623 (5th Cir. 2023).

[156] *Rex Real Estate*, 80 F.4th at 623 (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009)).

[157] *Id.* (citation omitted).

systematic consumer surveys, or both."[158]  Although a plaintiff need not show proof of swayed consumer purchases to demonstrate actual confusion, the Fifth Circuit requires more substantial evidence of confusion where the confusion does not result in swayed purchases.[159]  Indeed, "very little proof [of actual confusion] is required when customer purchases were actually swayed.  However . . . more [proof of actual confusion] is required when the confusion did not or cannot sway purchases."[160]  Further, "proof of actual confusion not involving swayed customer purchases should be weighed against the parties' total volume of sales."[161]

While "proof of actual confusion is not limited to actual or potential customers,"[162] Fifth Circuit precedents "give varying weight to evidence of actual confusion, depending on whether it is short-lived confusion by individuals casually acquainted with a business or lasting confusion by actual customers."[163]  "[I]solated instances of confusion about the affiliation of two companies that do not result in redirected business are not enough to sustain a finding of actual confusion."[164]

Here, Plaintiff's evidence of actual confusion is entirely anecdotal and consists of a FedEx driver's conflation of the Plaintiff's office with that of the Defendant and a total of 7 phone calls received by Plaintiff at its Baton Rouge office from individuals

---

[158] *Id.* (quoting *Streamline*, 851 F.3d at 457).

[159] *Id.* at 624–25.  The Court recognizes what the Fifth Circuit recently called its "muddled" caselaw regarding whether a sale is required for proof of actual confusion.  *See id.* at 624 n.3 (quoting *Savage Tavern, Inc. v. Signature Stag, L.L.C.*, 589 F. Supp. 3d 624, 655 (N.D. Tex. 2022)).

[160] *Id.* at 625.

[161] *Id.*

[162] *Id.* at 627 (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)).

[163] *Id.* at 625–26 (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 n.11 (1982).

[164] *Id.* at 625.

looking for another "Rampart" business, purportedly Defendant.[165]  As for the FedEx driver incident, Plaintiff explains that on one occasion in September 2023, a FedEx driver mistakenly went to Defendant's office instead of Plaintiff's to deliver a package and informed Plaintiff's President that she found the similar names of the parties confusing.[166]  While relevant[167], this singular example does not amount to much as the FedEx driver was not a consumer or potential consumer of either the Plaintiff or the Defendant and appears to have been only briefly confused about the parties' names.  Proof of actual confusion requires more.

Next, as to the phone calls, in each call the caller sought assistance with services that Plaintiff does not engage in—namely, deposit refunds, property maintenance, collection of rental and lease payments, leases involving "units," and information about Section 8 housing.[168]  Indeed, Plaintiff's employees quickly grasped that the calls were made in error due to the questions posed by the callers and they informed the callers that they had the wrong number.[169]  Defendant contends that the callers may have been trying to reach an unrelated entity, perhaps "Rampart Apartments," and that the evidence is entirely speculative.[170]  While it is clear that

---

[165] *See* R. Doc. 1-5; R. Doc. 1-6; R. Doc. 1-7; R. Doc. 18-1.

[166] *See* R. Doc. 1-3, *Butler Decl.*, at ¶ 6.

[167] *See Rex Real Estate*, 80 F.4th at 627 ("Plaintiff presents two instances of third parties confusing the companies or their locations. As we have explained, those anecdotes are relevant because proof of actual confusion is not limited to actual or potential customers." (citing *Fuji*, 754 F.2d at 597)).

[168] *See*, *supra*, pp. 4–6; *see also* R. Doc. 1-5; R. Doc. 1-6; R. Doc. 1-7; R. Doc. 18-1.

[169] *See id*.

[170] *See* R. Doc. 11 at p. 20 ("Rather, these examples simply assume—without evidence—that these individuals were trying to reach Defendant RW, rather than one of the many other third-party 'Rampart' entities.").

each caller mistakenly called the Plaintiff, there is limited evidence[171] that the callers intended to call the Defendant or that they conflated the Plaintiff with the Defendant.

Even assuming that each caller had meant to contact the Defendant, the Court does not find Plaintiff's evidence of actual confusion to be particularly weighty. As Defendant argues, Plaintiff does not allege or provide any evidence that any of its own customers were either confused or actually swayed into doing business with Defendant.[172] Indeed, the Defendant's President avers that the Defendant has not received any inquiries from customers seeking Plaintiff's services or asking whether the parties are associated with one another.[173] Nor is there any evidence that Defendant's customers have been swayed into purchasing services from the Plaintiff.[174] Although evidence of swayed consumer purchases is not required to show actual confusion, "more [proof of actual confusion] is required when the confusion did not or cannot sway purchases."[175] Plaintiff largely fails to provide such sufficient proof.

Plaintiff's examples show only a "fleeting mix-up of names"[176] by persons who are not direct customers of either party. Again, Defendant's clients are the property

---

[171] For example, some of the callers indicated that they were trying to reach "Rampart." *See, e.g.*, R. Doc. 1-3, *Butler Decl.*, at ¶ 9(a), (b), (c), (e).

[172] *See Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n.*, 651 F.2d 311, 319 (5th Cir. 1981) (finding only a "negligible" amount of actual confusion where, "[i]n three years, less than fifteen such incidents were reported . . . [and] none of the remarks was made by a potential customer considering whether to transact business with one or the other of the parties.").

[173] *See* R. Doc. 11-1, *Pappalardo Decl.*, at ¶¶ 21–23, 25–26.

[174] Nor, for that matter, is there any evidence that one of Plaintiff's customers, or a landowner seeking to contact Plaintiff, has mistakenly contacted the Defendant. *See id.*

[175] *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 625 (5th Cir. 2023).

[176] *Id.* at 624 (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017)).

owners themselves and not the individual tenants who appear to have mistakenly contacted the Plaintiff.[177]  Accordingly, none of the callers appear to have been trying to do business with the Defendant itself, but perhaps with a client of the Defendant.[178] While Plaintiff presents some relevant evidence of actual confusion, the lack of evidence of any customers swayed into doing business with Defendant affords less weight to this evidence.[179]  Furthermore, when weighed against the volume of business conducted by the parties, the weight of Plaintiff's evidence—seven phone calls— is lessened.[180]  Although precise figures for the parties have not been provided to the Court, it is not disputed that both parties operate in several states, provide complex services to sophisticated clients, and interact with a wide swath of the public.[181]  Moreover, the Defendant claims to manage over 10,000 multifamily units and over eighteen million square feet of commercial real estate space.[182]  It thus appears at this juncture that the volume of business of each party serves to lessen the weight of Plaintiff's evidence of confusion.  In sum, because the Plaintiff has provided some minimal but relevant evidence of actual confusion, the Court finds that this factor leans slightly in favor of Plaintiff.

---

[177] *See* R. Doc. 11-1, *Pappalardo Decl.*, at ¶¶ 31, 35 ("[O]ur customers are sophisticated real estate developers and/or property owners . . . .").

[178] *See Rex Real Estate*, 80 F.4th at 627 ("[U]nder *Armco*, proof that the plaintiff is receiving calls from people who are trying to do business with the other party can still be relevant even where there is no realistic possibility that business can be diverted." (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 (5th Cir. 1982))).

[179] *See id.* at 625–26 (citing *Armco*, 693 F.2d at 1160 n.11).

[180] *See id.* at 627 ("These instances are relevant, but their weight is lessened by Plaintiff's and Defendant's high volume of business and extensive advertising." (citing *Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n.*, 651 F.2d 311, 319 (5th Cir. 1981))).

[181] *See* R. Doc. 1-3, *Butler Decl.*, at ¶¶ 4–5.

[182] *See* R. Doc. 1-2 at p. 2.

### 8.   Care Exercised by Potential Purchasers

To determine the degree of care exercised by potential purchasers, the Court looks to "both the kind of goods or services offered and the kind of purchasers."[183] Generally, the more expensive the goods and services are, the more likely it is that potential purchasers will exercise a heightened degree of care, although "a high price tag alone does not negate other [digits of confusion]."[184]   When the potential purchasers are "professional and institutional" purchasers, they "are virtually certain to be informed, deliberative buyers."[185]

Plaintiff's primary business operations are "right of way acquisition, permitting, land services, real estate brokerage, and property management services."[186] Plaintiff admits that its clients include, *inter alia*, ExxonMobil, the City of Baton Rouge, Entergy Louisiana, and "a private landowner [seeking] to market and sell property in Hammond, Louisiana."[187] By all evidence, Plaintiff's clients are sophisticated municipal and corporate entities approaching Plaintiff to assist them with complex land use issues.[188]   Similarly, Defendant's clients include real estate developers and owners of commercial and multifamily property.[189]   The record evidence reflects that the parties' clientele are sophisticated entities who exercise care in acquiring the types of services provided by the parties.[190] After all, "it is hard

---

[183] *Rex Real Estate*, 80 F.4th at 627.
[184] *See id.* (quoting *Streamline*, 851 F.3d at 458) (alteration in original).
[185] *Id.* (quoting *Oreck Corp. v. U.S. Floor Sys., Inc.,* 803 F.2d 166, 173 (5th Cir. 1986)).
[186] R. Doc. 4-1 at p. 2.
[187] R. Doc. 1 at ¶ 16.
[188] *See* n.138.
[189] R. Doc. 11-1, *Pappalardo Decl.*, at ¶¶ 31, 35.
[190] *See id.* at ¶ 35 ("[O]ur property owner customers undergo a fairly sophisticated and vigorous request for services before we may render our property management services to these customers.").

to deny that commercial real estate market participants are, by and large, sophisticated consumers."[191]

The Fifth Circuit has said that "large corporate entities and wealthy individuals investing in commercial and residential real estate" are "virtually certain to be informed, deliberative buyers."[192]   Given that Plaintiff's current customers include ExxonMobil, the City of Baton Rouge, Entergy Louisiana, and "a private landowner . . . in Hammond, Louisiana,"[193] the Court finds that its potential purchasers generally exercise a high degree of care.   The same is true as to the Defendant's customers.   Therefore, this factor weighs against finding a likelihood of confusion.

Plaintiff resists this conclusion by contending that as part of the services it renders it "routinely works with property owners who are laypersons."[194]   Plaintiff's President describes the nature of its communication with landowners as follows:

> Plaintiff's work regularly requires us to engage in massive public outreach efforts, where we seek to communicate with thousands of landowners as both the dispatcher and return recipient of such parcels of mail.  It is critical to our business that all of the communications with landowners occur within limited periods of time *in order for our clients to successfully acquire land*.   The possibility that landowners may inadvertently mistake Defendant for Plaintiff could cause huge disruptions in our business.[195]

---

[191] *Rex Real Estate*, 80 F.4th at 627 (quoting *Int'l Council of Shopping Centers, Inc. v. RECONCRE, LLC.*, 2021 WL 148387, at *5 (D.D.C. Jan. 14, 2021)).

[192] *Id.* (quoting *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986)) (internal quotation marks omitted).

[193] R. Doc. 1 at ¶ 16.

[194] R. Doc. 18 at p. 5.

[195] R. Doc. 1-3, *Butler Decl.*, at ¶ 8 (emphasis added).

However, none of these allegedly "unsophisticated" persons with whom Plaintiff purportedly interacts with are actual *clients* or *customers* of the Plaintiff; rather they are persons whom Plaintiff interacts with "in order for [its] clients to successfully acquire land."[196]  The upshot of Plaintiff's argument would largely undermine this factor as it could be said that nearly every company, no matter how sophisticated their customers are, necessarily interacts in some capacity with unsophisticated members of the public.  Yet, this factor asks only to consider the "degree of care exercised by potential purchasers," not of anyone who comes into the Plaintiff's path. Plaintiff has also not brought any caselaw to the Court's attention showing that the Court should consider the care exercised by non-purchasers of the services offered by the parties.  Moreover, although Plaintiff couches the landowners it interacts with as "unsophisticated," Plaintiff has provided no evidence to support that conclusion or any evidence that a single landowner has actually confused the Plaintiff with the Defendant.  In sum, the Court does not find Plaintiff's argument to undermine the Court's finding that this factor weighs in favor of Defendant.

### 9.  Weighing the Digits

The digits point in several different directions—some in favor of a likelihood of confusion, some against, and others neutral.  Specifically, three digits weigh in Plaintiff's favor (1, 3, and 7), three weigh in favor of the Defendant (2, 4, and 8), and two are neutral (5 and 6).  While a finding of a likelihood of confusion "need not be supported by a majority" of the digits, the Court does not find that the Plaintiff has

---

[196] *Id.*

met its burden in demonstrating a likelihood of success as to a likelihood of confusion. Plaintiff has at most shown only a "mere possibility" of confusion, not a "probability" as is required to demonstrate likelihood of confusion.[197]  Of the two digits which the Fifth Circuit has said have "special importance"[198]—the sixth and the seventh—one is neutral and the other weighs only slightly in favor of the Plaintiff.  The Court finds it is unlikely that the parties' sophisticated clientele would confuse Plaintiff's mark with that of the Defendant, especially given the limited similarity of the marks.  At bottom, Plaintiff has failed to meet its burden in demonstrating that it is entitled to the "extraordinary remedy"[199] of a preliminary injunction.  Plaintiff has not demonstrated that a  likelihood of confusion is probable and thus cannot show a likelihood of success on the merits, dooming its application for a preliminary injunction.[200]  The Court denies Plaintiff's Motion.

---

[197] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 228 (5th Cir. 2009) (citing *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)); *accord* Restatement (Third) of Unfair Competition § 35, cmt. h (1995) ("Absent special circumstances, courts will ordinarily grant a preliminary injunction in a trademark infringement action if there is *strong evidence* of a likelihood of confusion.") (emphasis added).

[198] *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 298 (5th Cir. 2020).

[199] *Planned Parenthood of Houston & Se. Texas v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quoting *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara* 335 F.3d 357, 363 (5th Cir. 2003) (internal quotation marks omitted)).

[200] Because Plaintiff has not "clearly carried the burden of persuasion" on the first preliminary injunction requirement, the Court does not consider the three remaining requirements. *See id. Cf. Premium Parking Serv., LLC v. Olivier*, No. CV 23-3405, 2023 WL 5275219, at *5 (E.D. La. Aug. 16, 2023) (Vitter, J.) (finding that an application for temporary restraining order must be denied where the applicant failed to meet one of the four requirements for temporary injunctive relief).

## IV.    CONCLUSION

For the above reasons,

**IT IS HEREBY ORDERED** that the Plaintiff's Motion for Preliminary Injunction[201] is **DENIED**.

New Orleans, Louisiana, January 18, 2024.

**WENDY B. VITTER**
**United States District Judge**

---

[201] R. Doc. 4.